

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

ANN GAVIN, PAUL GAVIN,
FAMM STEEL, INC. AND
AUSTIN REALTY, LTD.,

    Plaintiffs,

v.

SOVEREIGN BANK,

    Defendant.

CIVIL ACTION NO: _____

## COMPLAINT

This is an action based in lender liability for the Defendant's breach of implied covenants and duties of good faith and fair dealing, and for other self-dealing and tortious conduct amounting to intentional misrepresentation giving rise to violations of M.G.L. c. 93A. The Defendant's actions throughout the course of its banking relationship with Plaintiffs culminated with the Defendant's reckless disregard for the success of Plaintiffs' otherwise growing steel business, thereby destroying it.

### Parties and Jurisdiction

1.    Plaintiff, Ann Gavin ("Gavin"), is a New Hampshire citizen residing in Brookline, New Hampshire.

2.    Plaintiff, Paul Gavin ("Paul Gavin"), is a New Hampshire citizen residing in Mason, New Hampshire.

3.    Plaintiff, FAMM Steel, Inc. ("FAMM"), is a corporation duly organized and existing under the laws of the State of New Hampshire with a principal place of business at 8

1038609v1

Townsend Road, Mason, New Hampshire. At all relevant times herein, FAMM operated a steel fabricating business at 97 Hunt Hill Road, Rindge, New Hampshire (the "Property").

4.      Plaintiff, Austin Realty, Ltd. ("Austin"), is a corporation duly organized and existing under the laws of the State of New Hampshire with a principal place of business at 8 Townsend Road, Mason, New Hampshire. At all relevant times herein, Austin was the record title owner of the Property.

5.      Defendant, Sovereign Bank ("Sovereign" or the "Bank"), is a corporation duly organized and existing under the laws of the State of Pennsylvania with a principal place of business at 75 State Street, Boston, Massachusetts.

6.      Pursuant to 28 U.S.C. §1332, this Court has jurisdiction over this matter based on the diverse citizenship of the parties and becuase the matter in controversy exceeds $75,000 exclusive of interest and costs.

7.      Venue in this district is proper in that Sovereign was subject to its personal jurisdiction at the time of commencement of this action.

## Background Facts

8.      In the fall of 1994, FAMM took possession of the assets of Monadnock Fabricators ("Monadnock") and opened a local, family-owned steel fabricating business in Rindge, New Hampshire. FAMM began operations out of a 50,000 square foot facility on 15 acres of land (the "Facility").

9.      Gavin served as President and Secretary of FAMM and her father, Paul Gavin, served as FAMM's Vice President and Treasurer. When the business started there were four other stockholders and approximately twelve employees.

2

10.    FAMM built such projects as professional ballparks, arenas, hotels, apartment and condominium buildings, parking structures, hospital and university additions, office buildings and cinemas. FAMM successfully completed projects throughout the Northeast from Maine to Pennsylvania.

11.    In the spring of 1995, FAMM formally purchased Monadnock's business assets and Austin purchased the Property with the assistance of a private investor. By the end of 1995, FAMM posted sales revenue of $1.8M, which grew to $6.5M by the close of 1996, to over $27M by close of 2000.

12.    Owing to its rapid expansion, yet constrained by the capacity limitations of its existing fabrication Facility, FAMM developed a plan to, 1) expand the physical Facility; and 2) increase the efficiency of its operations by purchasing state-of-the-art fabrication equipment and reconfiguring material flow from within.

13.    Beginning in the spring of 2001, and continuing throughout the remainder of 2001 and into 2002, FAMM expanded its Facility to meet demand, taking delivery of new, sophisticated equipment and related systems designed to increase productivity and efficiency.

14.    Despite the disruption associated with construction throughout the Facility, and the implementation of new machinery and technology, and further in spite of the economic slow-down caused by the September 11th terrorist attacks, FAMM continued to produce product.

### The 1998 Loan Documents

15.    During the fall of 1998, FAMM began a banking relationship with Fleet National Bank ("Fleet"). Fleet's Vice President, Edward M. Powers ("Powers"), was FAMM's main point of contact and was instrumental in helping FAMM to obtain the necessary funding to help grow the business.

3

16.     On or about December 30, 1998, FAMM and Austin executed and delivered to Fleet a Letter of Credit Reimbursement Agreement (the "1998 Bond Agreement") in order to obtain $1,515,000 (the "1998 Bond") from the Business Finance Authority of the State of New Hampshire (the "Issuer" or "BFA") to build an addition. The 1998 Bond was borrowed by the BFA from GE Capital Public Finance, Inc. (the "Bond Holder" or "GE Capital").

17.     Pursuant to the terms of the 1998 Bond Agreement, FAMM and Austin jointly and severally agreed to borrow the 1998 Bond from the BFA and repay, with interest, directly to GE Capital, as Assignee. The 1998 Bond was used to acquire certain equipment and build a 35,000 square foot addition at the Facility.

18.     Together with the 1998 Bond Agreement, FAMM and Austin executed a Standby Letter of Credit (the "1998 LOC"), to be issued by Fleet in the amount of $1,541,462 to secure their repayment of the 1998 Bond to GE Capital.

19.     In consideration of Fleet issuing the 1998 LOC, FAMM and Austin jointly and severally executed and delivered a note (the "1998 Demand Note") made payable on demand to Fleet, according to its terms, in the principal amount of $1,541,462 with interest thereon. The 1998 Demand Note evidenced the reimbursement obligations of FAMM and Austin to Fleet under the terms of the 1998 Bond Agreement.

20.     On or about December 30, 1998, FAMM executed and delivered the following documents, each in favor of Fleet:

a)      a Commercial Revolving Line of Credit Promissory Note (the "1998 Line Note") made payable to Fleet, according to its terms, in the principal amount of $1,000,000 with interest thereon. This 1998 Line Note evidenced FAMM's

4

indebtedness under a line of credit to Fleet, in which the proceeds were to be used for working capital.

b)    a Commercial Term Note (the "1998 FAMM Term Note") made payable to Fleet, according to its terms, in the principal sum of $233,000 with interest thereon and maturing on January 2, 2004. Proceeds from the 1998 FAMM Term Note were used to payoff an unrelated third-party debt.

c)    a Commercial Term Note (the "1998 Austin Note") made payable to Fleet, according to its terms, in the principal sum of $900,000 with interest thereon and maturing on January 2, 2004. Proceeds from the 1998 Austin Note were used to payoff the first mortgage encumbering the Property.

21.    Ann and Paul Gavin each, individually, executed and delivered a Limited Guaranty guaranteeing the obligations of FAMM and Austin under the 1998 loan documents, limited to $200,000.

22.    The 1998 Bond Agreement, the 1998 LOC, the 1998 Demand Note, the 1998 Line Note, the 1998 FAMM Term Note and the 1998 Austin Term Note, each given on or about December 30, 1998, are collectively referred to herein as the 1998 Loan Documents. The 1998 Loan Documents were secured, inter alia, by a Loan and Security Agreement of even date given by FAMM, Austin and both Paul and Ann Gavin as individual guarantors.

23.    As a result of the 1998 Loan Documents, FAMM was able to take on additional projects, partially upgrade the aging equipment previously obtained from Monadnock and build the addition.

24.    Due to the capacity limitations referred to above, FAMM endeavored to pursue its expansion plan, with Powers' full support, having moved over to Sovereign Bank, successor-in-

5

interest to Fleet ("Sovereign"). On or about September 29, 2000, FAMM, Austin, and Ann and Paul Gavin executed and delivered the First Amendment to [the] Loan and Security Agreement for the purpose of extending and increasing the amount of FAMM's 1998 Line Note. Ann and Paul Gavin reaffirmed their personal guarantees.

25.     On or about this same date, September 29, 2000, FAMM executed and delivered to Sovereign the First Amendment to [the] Revolving Line of Credit Promissory Note for the purpose of increasing the principal amount of the 1998 Line Note from $1,000,000 to $1,300,000 to be used for working capital, while extending the termination date to December 31, 2000.

26.     Thereafter, on or about December 28, 2000, FAMM, Austin, and Ann and Paul Gavin executed and delivered to Sovereign the Second Amendment to [the] Loan and Security Agreement to further expand and increase the amount of FAMM's 1998 Line Note, which subsidized the purchase of fabrication equipment and planned Facility expansion. Ann and Paul Gavin again reaffirmed their personal guarantees.

27.     On or about December 28, 2000, FAMM executed and delivered to Sovereign the Second Amendment to [the] Revolving Line of Credit Promissory Note for the purpose of further increasing the principal amount of the 1998 Line Note from $1,300,000 to $2,000,000 while extending the termination date to May 31, 2002 (as amended, the "Line Note").

## The 2001 Expansion

28.     Throughout 2001, FAMM continued with its construction to expand the Facility, building additions to both the north and south ends of the existing structure. As part of its expansion, FAMM installed two heavy duty conveyor systems designed to increase efficiency by reducing material handling waiting times for overhead cranes. The additions provided FAMM with dedicated areas for miscellaneous metals fabrication, specialty painting and truck loading.

FAMM was certified by the American Institute for Steel Construction (AISC) for Sophisticated Paint Endorsement in addition to its overall structural steel certification for Complex Buildings and Simple Bridges.

29.     For the duration of the construction project, FAMM and Sovereign anticipated and, indeed, planned on no-growth sales due to the inefficiencies resulting from the ongoing renovation and expansion.

## The 2001 Amendments and Loan Documents

30.     On or about August 3, 2001, FAMM, Austin, and Ann and Paul Gavin, executed and delivered to Sovereign the Third Amendment to [the] Loan and Security Agreement in order for Sovereign to make an additional $300,000 term loan to FAMM, and for it to issue two additional Standby Letters of Credit (collectively, the "2001 LOC") in the aggregate principal amount of $3,500,000 to secure the payment of $3,500,000 in revenue bonds issued by the BFA and purchased from GE Capital.

31.     On or about August 3, 2001, FAMM executed and delivered a Commercial Term Promissory Note (the "2001 Note") made payable to Sovereign, according to its terms, in the principal sum of $300,000 with interest thereon and maturing on August 1, 2006.  Proceeds from the 2001 Note were used to pay certain costs and expenses associated with the Third Amendment and to reduce the $2,000,000 balance owing on its line of credit having resulted from the amended 1998 Line Note.

32.     On or about August 3, 2001, FAMM and Austin executed and delivered to Sovereign a Letter of Credit Reimbursement Agreement (the "2001 Bond Agreement") for the purposes of obtaining $3,500,000 (the "2001 Bond") from the BFA.  The 2001 Bond was borrowed by BFA from GE Capital.

33.     Pursuant to the terms of the 2001 Bond Agreement, FAMM and Austin jointly and severally agreed to borrow the 2001 Bond from the BFA and repay, with interest, directly to GE Capital, as Assignee.

34.     The 2001 Bond consisted of a Series A Bond, the proceeds of which were used to construct 32,000 and 12,600 sq. ft additions on the North and South ends of the Facility, and for other Facility renovations and improvements.

35.     In addition, the 2001 Bond consisted of a Series B Bond, the proceeds of which were used to finance the Equipment for the design, acquisition, assembly and installation of new machinery and equipment at the Facility.

36.     Pursuant to the 2001 Bond Agreement, FAMM and Austin executed two (2) Standby Letters of Credit (collectively, the "2001 LOC") issued by Sovereign to secure repayment of the Series A and B Bonds to GE Capital.

37.     On or about August 3, 2001, in consideration of Sovereign issuing the Series A Bond Standby Letter of Credit, FAMM and Austin jointly and severally executed and delivered a demand note (the "2001 Series A Demand Note") made payable on demand to Sovereign, according to its terms, in the principal amount of $1,250,000 with interest thereon. The 2001 Series A Demand Note evidenced the reimbursement obligations of FAMM and Austin under the terms of the 2001 Bond Agreement.

38.     Further, on or about August 3, 2001, in consideration of Sovereign issuing the Series B Bond Standby Letter of Credit, FAMM and Austin jointly and severally executed and delivered a demand note (the "2001 Series B Demand Note") made payable on demand to Sovereign, according to its terms, in the principal amount of $2,250,000 with interest thereon.

8

The 2001 Series B Demand Note evidenced the reimbursement obligations of FAMM and Austin under the terms of the 2001 Bond Agreement.

39.    Beginning in or about January 2002, FAMM was in need of a full-time financial manager. Powers intervened, requiring that Gavin hire someone that he and Sovereign could work with. Specifically, he directed FAMM to hire David Lee ("Lee"), an outside financial consultant, who was already known to the Bank, on at least an interim basis until the full-time financial manager position could be filled. He told Gavin, "he's the choice the Bank has made and the Bank will approve of no one else." Later, when Gavin contacted Lee, she learned that he had already been contacted by Powers and told that he would be hired. Powers instructed Gavin that Lee would be representing the Bank in the hiring process for a new financial manager and that Lee would approve the candidate on behalf of Sovereign.

40.    In March, 2002, as a result of Lee's recommendation to Powers, the Bank directed FAMM to hire Keith Woolford ("Woolford"), of Jaffrey, New Hampshire, and further instructed FAMM to extend Lee's contract and pay him, 1) to supervise and train Woolford, and 2) to lend general oversight to FAMM's accounting department and report back to Powers on a periodic basis.

41.    Lee's initial responsibilities included creating quarterly cash flow projections; reporting on accounts receivable; and, creating a fiscal year budget to present to Powers which would necessarily include projected sales revenue and net earnings.

42.    Lee communicated directly with Powers at Sovereign, to the exclusion of Gavin and the rest of FAMM. By way of example, after his first quarter at FAMM in May 2002, Lee met with Powers to discuss Q1 projections. Following this meeting, Lee was required by Powers to submit revised figures for Qs 2-4, reducing revenue projections.

9

43.     Powers made it known to Lee and others at FAMM that he did not like Gavin and could not deal with her because she was too demanding and, according to Powers, did not show him enough respect. Indeed, it turned out that Powers met frequently with Lee behind Gavin's back. Lee, just a consultant, would commit FAMM to certain thresholds of business that would affect FAMM's ability to meet certain financial covenants with the Bank.

44.     Even after hiring Woolford, Lee continued to be responsible for preparing a monthly financial reporting package to be presented to Powers which would illustrate company performance against projections. By July 2002, Lee, at least reportedly, had prepared a review of every balance sheet account from which he indicated several accounts that contained the potential for profit and loss exposure, including cash, accounts receivable, accounts payable, sales tax and accrued expense, plus other accounts for which exposure was then unknown.

### The 2002 Amendments Followed by Lee's Departure

45.     On or about July 31, 2002, FAMM, Austin, and Ann and Paul Gavin, executed and delivered to Sovereign the Fourth Amendment to [the] Loan and Security Agreement in order to extend the term of the 1998 Line Note as amended, grant certain waivers, and modify certain financial covenant provisions in the Loan Documents.

46.     The parties further amended the Revolving Line of Credit Promissory Note and a certain Availability Letter (the "Third Amendment to Revolving Line of Credit Promissory Note" and "Third Amendment to Availability Letter"). With the Fourth Amendment to [the] Loan and Security Agreement, the loan documents would be referred to as the "Fourth Modification Documents". Ann and Paul Gavin again reaffirmed their personal guarantees.

47.     By October, 2002, with Lee and Woolford having made apparent progress with FAMM's financial books and records, meaning that they had conducted their necessary reviews

10

and projections on an as needed or required basis, and further believing in a profitable forecast, FAMM hosted an open house celebration wherein it provided tours of its new Facility, and related machinery and technology. FAMM invited customers, vendors, architects and engineers to this large-scale marketing event. It further undertook office remodeling and endeavored to provide its employees with bonuses for year-end 2002.

48.     As part of his duties, Lee had been asked to prepare certain 2003 budgetary information to assess cost allocations which were necessary for FAMM to determine its pricing. This pricing, in turn, would enable FAMM to competitively bid jobs, given especially FAMM's renovations and resulting reduction in direct labor costs.

49.     Lee repeatedly ignored Gavin's requests, forcing FAMM to retain Michael Ciampa ("Ciampa"), an outside financial consultant, to help prepare the necessary budgets.

50.     On November 14, 2002, Lee abruptly resigned as FAMM's outside financial consultant. Unbeknownst to FAMM, Lee had already discussed his departure with Powers. He provided Gavin with his overview of FAMM's accounts as of October 31, 2002, wherein it was revealed for the first time that certain accounts had not been reconciled or reviewed since Lee started.

51.     As a result of Woolford's and/or Lee's failure to reconcile bank statements and post adjustments to the accounting records, the cash adjustments through December 2002, necessary to correct the accounting records, totaled more than $1,000,000.

52.     Owing to Lee's unexpected resignation, Gavin then hastened to retain Leo Correia ("Correia") to serve as yet another outside financial consultant to, 1) review and assess FAMM's books and records; and, 2) assist Ciampa with creating the necessary 2003 budgets. Ciampa and

11

1038609v1

Correia were to work with Paul Seelye, FAMM's outside CPA, who was also asked to assist in this process.

53.    By the end of December 2002, after weeks of reviewing the company's records, Ciampa, Correia and Seelye advised that financial numbers had been "plugged" and had been grossly misrepresented by Lee and Woolford. The plugged entries were not based on facts and were not supported by appropriate documentation. None of FAMM's general ledger accounts had been reconciled, monthly sales taxes were not being paid, and general ledger entries had been created to increase sales, which figures had already been provided to Sovereign. Job revenues for work in progress had been overstated by approximately $1,000,000. Moreover, FAMM's bank accounts had not been reconciled for the previous year, resulting in improper cash management practices wherein approximately $500,000 had been left in a depository account at Bank of New Hampshire, while fees were being incurred in a transition account at Sovereign. On January 3, 2003, Gavin terminated Woolford's employment.

### Sovereign, Through Bowen, Misguides and Misrepresents the Bank's Stated Objective of a Turnaround for FAMM

54.    Gavin immediately solicited Powers for a meeting to advise of Woolford's termination and discuss Lee and Woolford's apparent misconduct over the prior year. Gavin further advised Powers of the accounting irregularities, Lee's lack of oversight and supervision, and she criticized him for "requiring" that FAMM hire Lee in the first place. Powers responded by pronouncing that FAMM needed to hire a Bank-approved turnaround consultant. Accordingly, Powers directed FAMM to hire Joe Picano ("Picano"), a work-out consultant known to Sovereign, who, in theory, would represent FAMM in discussions with the Bank.

55.     Sovereign instructed FAMM to employ hand-picked consultants which were plainly not qualified. Once their mistakes were identified and rectified, at great time and expense to FAMM, Sovereign adopted an unreasonable fiduciary position.

56.     Owing to the bank-imposed professionals' intentional and/or negligent misrepresentations over the prior year, FAMM was caused to unknowingly violate certain borrower financial covenants (i.e. Adjusted Fixed Charge Coverage Ratio). Nonetheless, FAMM continued to report to the Bank and, as important, remained current under its loan by paying the debt service as it became due. Still, FAMM had been forced to hire these Bank-imposed professionals at a cost in excess of $90,000.

57.     While in a critical transition period during which FAMM worked diligently to correct its financial records and projections and at the same time maintain daily operations, Sovereign then, without notice, stopped the automatic sweep between its checking account and line of credit causing cash to build up in its checking account while clearing checks against its line of credit. Sovereign's action caused FAMM's bank account to be overdrawn and to incur fees. Notwithstanding that FAMM was forced to manually manage its account via on-line banking, Sovereign was unable to provide FAMM with the necessary on-line registration and access leaving FAMM in a "blind" position to manage its account.

58.     Sovereign's termination of FAMM's sweep accounts and mishandling of related bank charges and general disbursement accounts cost FAMM credibility issues and penalties with its subcontractors, suppliers, tax collection agencies, and others. Sovereign's refusal to correct their mistakes and take third-party telephone calls caused the company's cash position to erode because subcontractors and suppliers needed to be paid first.

1038609v1

59.     On or about March 12, 2003, Gavin and Picano met with John Bowen ("Bowen"),
Sovereign's work-out Vice President. Bowen advised that he would be issuing FAMM a
forbearance agreement by the close of the month to cure and/or resolve any covenant violations.
Further, the agreement was to afford the parties the time and flexibility to discuss the prospect of
FAMM terminating the relationship and starting anew with a different bank.

60.     As part of the forbearance process, Bowen required that FAMM's line of credit be
paid down. It was expressly stated by Bowen, and understood by FAMM, that such deposit
would trigger the agreement and a further extension. Instead, after FAMM made its deposit, the
line of credit was terminated - - without notice of any kind.

61.     Contrary to Bowen's statement, no forbearance agreement was ever received. In
fact, over the next 12 months, or through March 2004, despite Bowen's repeated promises and
representations otherwise, no forbearance or other such agreements were ever received. As if to
somehow excuse his own behavior, Bowen would eventually comment, "I don't have time for
this account" or, "this account is not enough of a priority".

62.     By contrast, Gavin attended numerous meetings during which, each time, FAMM
would provide a proposal to Sovereign. In June 2003, Gavin, with Picano, presented to Bowen a
proposed loan amendment term sheet. As with the forbearance agreement, none of FAMM's
proposals were ever answered, nor did Sovereign ever respond to the proposed amended term
sheet. In addition, Sovereign's inaction and manipulative behavior destroyed FAMM's bonding
capacity and affected its ability to get jobs. Even despite Sovereign's inaction and loss of
bonding, FAMM continued with its reporting to Sovereign, providing cash flows, projections
and other such financial disclosures whenever requested. Moreover, Ann and Paul Gavin would
submit updated personal financial statements on request.

14

63.     Angry and upset over Sovereign's lack of response and apparent double-dealing, it became evident that Sovereign's primary objective and goal was to close FAMM, minimize the Bank's exposure and maximize the value of its credit.

64.     Ann and Paul Gavin, in turn, were adamant that they would not close the business as FAMM's operations and facility were reaching new heights. They further questioned why they were even in so-called "workout" in the first place.

65.     Throughout the remainder of 2003, Bowen and Sovereign refused to respond to proposals. FAMM's many proposals included a restructuring proposal, private cash buy-out offers, and a cash buy-out involving Bank of New Hampshire ("BNH") and Monadnock Business Ventures ("MBV") backed by State of New Hampshire guarantees. Despite telephone calls and messages, the Bank never responded to a single proposal. Bowen would not return calls from either FAMM or interested parties like BNH or MBV.

66.     Completely frustrated, and still using Picano, FAMM by-passed Bowen and approached Joe Campanelli, Sovereign's President for the New England region, complaining over the lack of response and attention to any of its proposals. In response, Picano conveyed to FAMM that Sovereign wanted a cash offer to close by December 31, 2003. It was further conveyed that an end-of-year closing was critical for the Bank. Ann and Paul Gavin hastened to secure the cash to close, leveraging their homes and retirement accounts, but again heard nothing in response. Bowen eventually responded for the Bank that he was on vacation and would not have time to close.

67.     In January 2004, Gavin sent to Bowen a request to discuss a proposed deal and timeline with one of FAMM's largest suppliers, Infra Metals. Despite requests, Bowen never contacted Infra Metals. FAMM proposed yet another deal involving a Detroit finance company,

15

the State of New Hampshire and MBV. Again, no response by Sovereign. Indeed, by February 2004, FAMM had identified and/or presented at least eleven entities it had contacted regarding cash, restructuring and/or refinancing proposals. Sovereign did not respond to any of them. Despite early remarks by Bowen that Sovereign wanted proposals and that they would be reviewed and that responses would be forthcoming, none ever were. Sovereign's condition that any proposal contain a release by FAMM in favor of Sovereign for the conduct and issues above, was rejected.

68.     Given the Bank's lack of response, refusal to cooperate and apparent unwillingness to consider legitimate purchase or refinance options, Gavin notified Sovereign in February 2004 that it would file for Chapter 11 bankruptcy protection and reorganize. So that there would be no record, Bowen advised her not to put FAMM's intent in writing to the Bank.

69.     By letter dated March 9, 2004, Gavin and FAMM learned that their loans had been sold to LINC Credit, LLC of Aurora, Colorado ("LINC"). By April 15, 2004, despite Gavin's earlier written protest and objection to Sovereign, LINC had closed down FAMM's Facility and operations.

70.     In spite of Sovereign's self-dealing and designs for selling the loans, FAMM was a growing business. By June 2003, FAMM had obtained certification by New Hampshire's Department of Transportation to be a Disadvantaged Business Enterprise ("DBE"). This DBE certificate allowed FAMM to receive preferential treatment during the awarding of state and federally funded projects. DBE requirements on projects can be as high as 15% to 20% of total contract value, and structural steel is generally regarded as 10% of the total project contract. FAMM was filing DBE applications in New York, Connecticut and Massachusetts as well.

16

71.     By August 2003, with the strengthening of the American dollar, FAMM's pricing

had become more competitive than that of the neighboring Canadian fabricators. FAMM was

being awarded multi-million dollar projects and, through increased marketing efforts, gained

opportunities to bid on military contracts, including a potentially long-term military project for

Ranor. In fact, for Ranor, when the Facility was being closed, FAMM was in the process of

building the prototype for this project - - a base for a military cannon. By the end of 2003, the

renovation of the Facility was complete and a backlog of work had been generated. Were it not

for the Bank's manipulative behavior to maximize their credit, and intentional and/or reckless

disregard for the Company as a going concern, FAMM would have a thriving successful

business today.

## COUNT I
### (Breach of Contract)

72.     The Plaintiffs hereby reallege and incorporate by reference the allegations

contained in paragraphs 1 through 71.

73.     Pursuant to the above-stated conduct, the Defendant is in breach of contract,

express and implied, and is liable to the Plaintiffs for the damages it has caused them to incur,

plus interest and costs and reasonable attorney's fees.

## COUNT II
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

74.     The Plaintiffs hereby reallege and incorporate by reference the allegations

contained in paragraphs 1 through 73.

75.     Throughout its dealings with the Plaintiffs, including a lending relationship

spanning more than five years, the Defendant had an implied obligation to act in good faith and

17

with fair dealing.  Sovereign's conduct, as set forth above, constitutes a violation of that obligation of good faith and fair dealing.

76.     Accordingly, by the above-stated conduct, the Defendant has breached the implied covenant of good faith and fair dealing owed to the Plaintiffs and by reason thereof, it is liable to the Plaintiffs for the damages it caused them to incur, plus interest, costs and reasonable attorney's fees.

## COUNT III
### (Violation of M.G.L. c.106, §1-203)

77.     The Plaintiffs hereby reallege and incorporate by reference the allegations contained in paragraphs 1 through 76.

78.     By the above-stated conduct, the Defendant has breached the Massachusetts Uniform Commercial Code provision imposing a good faith obligation in the performance and enforcement of all agreements and duties in commercial transactions and as a result of said breach, the Plaintiffs have incurred damage.

79.     Accordingly, the Defendant is liable to the Plaintiffs for the damages it has caused them to incur, plus interest, costs and reasonable attorney's fees.

## COUNT IV
### (In Tort: Breach of Duty of Good Faith and Fair Dealing)

80.     The Plaintiffs hereby reallege and incorporate by reference the allegations contained in paragraphs 1 through 79.

81.     The Defendant owed a duty to the Plaintiffs to refrain from self-dealing and to work with Plaintiffs to cure and/or resolve any covenant violations which Sovereign helped to create.

18

1038609v1

82.     The Defendant breached that duty when, through its inaction, unfulfilled promises and double-dealing, FAMM's loans were sold and the business was shut down, which cause is directly attributable to Sovereign.

83.     Pursuant to the above-stated conduct, the Defendant is in breach of its duties of care, good faith and fair dealing owed to the Plaintiffs and, by reason thereof, is liable to the Plaintiffs for the damages it has caused them to incur, plus interest, costs and reasonable attorney's fees.

## COUNT V
### (In Tort: Breach of Fiduciary Duty)

84.     The Plaintiffs hereby reallege and incorporate by reference the allegations contained in paragraphs 1 through 83.

85.     As a result of the lending relationship between Plaintiffs and Defendant, the Plaintiffs reposed their trust and confidence in the Defendant by entrusting the handling of FAMM's business affairs, including especially the management and oversight of its financial accounts, into the Bank's designated account representatives and Bank-imposed professionals. At the Bank's direction, the Plaintiffs placed their trust and confidence in these individuals in order to ensure the financial success of their company.

86.     By directing the Plaintiffs as to whom they must hire, by placing these individuals in positions of management and financial control, and communicating with them to the exclusion of Plaintiffs, the Defendant exercised pervasive control over FAMM during a critical period of its growth, thereby creating a special circumstance and imposing on it a fiduciary duty.

87.     As a result, the Defendant has breached its fiduciary duty to the Plaintiffs, and as a direct and proximate result of said breach, the Plaintiffs have sustained damage including interest, costs and reasonable attorney's fees.

19

1038609v1

## COUNT VI
### (Breach of Fiduciary Duty)

88.     The Plaintiffs hereby reallege and incorporate by reference the allegations
contained in paragraphs 1 through 87.

89.     By virtue of their relationship with the Defendant, the Plaintiffs reposed their trust
and confidence in the Defendant when they were unduly forced into the Bank's workout process.

90.     The Bank breached its duties to the Plaintiffs by failing to respond, refusing to
cooperate and appearing unwilling to consider Plaintiffs legitimate purchase or refinance options,
while at the same time imposing unreasonable demands to make deposits against the Line of
Credit, which FAMM made.

91.     By the above-stated conduct, and as a direct and proximate result of the
Defendant's breach, the Plaintiffs have sustained damages, including interest, costs and
reasonable attorney's fees.

## COUNT VII
### (Aiding and Abetting the Breach of Fiduciary Duty)

92.     The Plaintiffs hereby reallege and incorporate by reference the allegations
contained in paragraphs 1 through 91.

93.     By exercising undue control over the financial management of FAMM, the
Defendant undertook to exercise the duties of a fiduciary with respect to the bookkeeping,
financial reporting and management of FAMM's funds. The Defendant thereby undertook to
abide by a higher than ordinary standard of care.

94.     The Defendant either knew of, or acted with a reckless disregard as to whether its
bank-imposed professionals were breaching their fiduciary duties to FAMM. The Bank acted in

20

such a way as to substantially assist and/or to aid and abet those professionals' violation of their foregoing fiduciary duties.

95.     As a result of the aforestated violation of their fiduciary duties, and the Defendant's aiding and abetting said violations, the Plaintiffs have incurred damage for which the Bank is liable.

96.     As a direct and proximate result, the Defendant is liable to the Plaintiffs for the damages it has caused them to incur, plus interest, costs and reasonable attorney's fees.

## COUNT VIII
### (Instrumentality)

97.     The Plaintiffs hereby reallege and incorporate by reference the allegations contained in paragraphs 1 through 96.

98.     The Defendant assumed and exercised dominion and control over Plaintiffs by, among other things, directing and imposing upon the Plaintiffs the Bank's requirement that FAMM use the Bank's professionals and workout specialist to oversee and manage FAMM's bookkeeping and financial accounts.

99.     The Defendant used FAMM to further its own purposes, namely, the minimization of the Bank's exposure in connection with its credit advances to Plaintiffs.

100.    The Bank misused its control by putting FAMM into workout as a result of the Bank's own manipulative conduct, then refused to respond to any restructuring proposals or cash buy-out offers presented by FAMM, Austin or Ann and Paul Gavin, and further refused to deliver the necessary forbearance documents, instead making undue demands on Plaintiffs to pay down their line of credit. However, following such deposit by FAMM, the line of credit was terminated by the Bank - - without notice of any kind.

1038609v1

101.    The Bank exercised control for the express purpose of minimizing its exposure and maximizing the value of its credit.

102.    The Bank's exercise of control over FAMM created an agency relationship between the bank and FAMM, whereby the Bank became FAMM's agent.

103.    As FAMM's agent, the Bank owed a duty to act in good faith in the performance and enforcement of all agreements during the lending relationship.

104.    By the above-stated conduct, the Defendant breached its duty to the Plaintiffs.

105.    The Bank's breach of duty was the proximate cause of injury to the Plaintiffs, and the Plaintiffs have sustained damages including interest, costs and reasonable attorney's fees.

## COUNT IX
## (Fraud, Deceit and Intentional Misrepresentation)

106.    The Plaintiffs hereby reallege and incorporate by reference the allegations contained in paragraphs 1 through 105.

107.    The Defendant made statements and misrepresentations, hereinbefore alleged in this Complaint, as statements of fact which the Defendant, or its agents, knew were false, should have known were false when made and by which they made negligently, intentionally and/or recklessly. The Defendant's conduct amounts to material and intentional misrepresentations.

108.    The Defendant made those statements and/or representations both willfully and knowingly for the purpose of inducing the Plaintiffs to act and to rely upon them as being true, to their detriment.

109.    As a direct and proximate result, the Defendant is liable to the Plaintiffs in fraud and deceit as a result of said intentional and material misrepresentations for the damages it has caused them to incur, plus interest, costs and reasonable attorney's fees.

## COUNT X
### (Duress)

110. The Plaintiffs hereby reallege and incorporate by reference the allegations contained in paragraphs 1 through 109.

111. As set forth above, the Defendant wrongfully demanded and required that FAMM hire the Defendant's professionals to oversee and manage FAMM's financial affairs.

112. The Plaintiffs involuntarily accepted these bank imposed professionals and the exigency of the Bank's demands permitted no alternative.

113. As a direct and proximate result of the Defendant's wrongful influence, the Plaintiffs have suffered damage for which the Defendant is liable.

## COUNT XI
### (Interference with Advantageous Contractual/Business Relations)

114. The Plaintiffs hereby reallege and incorporate by reference the allegations contained in paragraphs 1 through 113.

115. As set forth above, FAMM sought buy-out proposals from its suppliers, legitimate refinance options with other lenders and, through its DBE certification, was being awarded multi-million dollar projects.

116. The Bank's actions, described above, were done without justifiable right or cause on the part of Sovereign, with a reckless disregard for the Plaintiffs' business, thereby interfering with the aforesaid business relationships.

117. As a direct result of the Defendant's actions and conduct amounting to interference with the Plaintiffs' advantageous business relations, the Plaintiffs have incurred damage for which the Defendant is liable.

23

## COUNT XII
### (Statutory – M.G.L. c.93A)

118.    The Plaintiffs hereby reallege and incorporate by reference the allegations contained in paragraphs 1 through 117.

119.    At all relevant times, the Defendant conducted trade or commerce in the Commonwealth of Massachusetts so as to come within the purview of Massachusetts General Laws, Chapter 93A.

120.    By the above-stated conduct, the Defendant has committed unfair and deceptive acts and practices in violation of M.G.L. c.93A, §11, and as a direct result thereof, the Plaintiffs have incurred damage.

121.    The Defendant's actions were committed intentionally and/or recklessly.

122.    Accordingly, the Defendant is liable to the Plaintiffs for treble the amount of monetary damages it has caused them to incur, plus interest, costs and reasonable attorney's fees.

**WHEREFORE**, the Plaintiffs, Ann Gavin, Paul Gavin, FAMM Steel, Inc. and Austin Realty, Ltd., respectfully request that the Court grant the following relief:

1.    Pursuant to Counts I - XI, judgment against Sovereign Bank for the damage it has caused Plaintiffs to incur, plus interest, costs and reasonable attorney's fees.

2.    Pursuant to Count XII, judgment against Sovereign Bank for treble the amount of damage it has caused Plaintiffs to incur, plus interest, costs and reasonable attorney's fees.

3.    Such other and further relief as this Court may deem just and equitable.

## Demand for Jury Trial

The Plaintiffs Hereby Claim A Trial By Jury On All Issues So Triable.

> **ANN GAVIN, PAUL GAVIN,**
> **FAMM STEEL, INC. AND**
> **AUSTIN REALTY, LTD.,**
>
> By their Attorneys,

Dated: _12/29/06_

> Douglas B. Otto (BBO# 555269)
> Jill K. Hauff (BBO# 653886)
> MORRISON MAHONEY LLP
> 250 Summer Street
> Boston, MA 02210
> (617) 737-8873